UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
:
IN RE STATE STREET BANK AND TRUST   :
CO. ERISA LITIGATION                                  :
:
This document relates to:                             :          07 Civ. 8488 (RJH)
:
07 Civ. 8488                                                    :
07 Civ. 9319                                                    :
07 Civ. 9687                                                    :
:
-----------------------------------------------------------X
:
NASHUA CORPORATION PENSION PLAN   :
COMMITTEE et al.,                                        :
:
                            Plaintiffs,                        :
:
v.                                                                   :          08 Civ. 0265 (unassigned)
:
STATE STREET BANK AND TRUST             :
COMPANY, STATE STREET GLOBAL          :
ADVISORS, INC., AND JOHN DOES 1-20,    :
:
                            Defendants.                      :
:
-----------------------------------------------------------X

## DECLARATION OF MARK DUGGAN

        MARK DUGGAN declares as follows:

        1.       I am Senior Managing Director and Deputy General Counsel of State Street

Global Advisors ("SSgA").  I make this declaration in support of the motion by State Street Bank

and Trust Company ("SSBT") and State Street Global Advisors, Inc. (together, "State Street"), to

transfer venue to the District of Massachusetts pursuant to 28 U.S.C.  § 1404(a) in the above-

captioned cases. This declaration is based upon my personal knowledge and upon review of SSgA's records.[1]

2.    SSBT is a Massachusetts trust company and a wholly-owned subsidiary of State Street Corporation. SSBT provides custodial and other financial services to institutional investors. While SSBT does have an office in New York, its principal place of business is in Boston.[2]

3.    SSgA is a division of SSBT with its principal place of business in Boston, Massachusetts. SSgA's primary business is to provide investment management services to institutional investors. SSgA does not have any offices in New York. Its employees, bank accounts and property are principally located in the Commonwealth of Massachusetts.

4.    It is my understanding that as of October 2007, approximately 1,137 SSgA employees – of a total 1,829 employees – worked in the United States. Of these 1,137 domestic employees, approximately 1,102, or approximately 97%, work in Massachusetts, while only 3 employees, or less than 1%, work in New York.

5.    These actions appear to arise out of SSgA's investment management of certain actively managed fixed income funds on behalf of Prudential Retirement Insurance and Annuity Company ("PRIAC"), the Unisystems, Inc. Employees Profit Sharing Plan ("the Unisystems Plan"), the Andover Companies Employees Savings and Profit Sharing Plan ("the Andover

---

[1] All four plaintiffs have named State Street Global Advisors, Inc., as a defendant. State Street Global Advisors, Inc., is a wholly-owned subsidiary of State Street Corporation that operates as a holding company for several underlying entities, but does not perform any of the investment management services that are, to my understanding, at issue in these cases. State Street Global Advisors ("SSgA") is a division of SSBT, but is not a separate legal entity and is not the same as State Street Global Advisors, Inc. SSgA performs the investment management services that I understand are at issue in these cases.

[2] State Street Corporation is also incorporated in, and has its principal place of business in, Massachusetts.

Plan"), and two retirement plans offered by the Nashua Corporation (together, "the Nashua Plan"), and other ERISA plans.

6.    All of the actively managed fixed income funds that I understand to be at issue in these cases were formed in Massachusetts and are managed by portfolio managers located there.

7.    It is my understanding that the Andover Plan was established for the benefit of employees of Merrimack Mutual Fire Insurance Company ("Merrimack"), a subsidiary of The Andover Companies. Merrimack is incorporated in Massachusetts and has its principal place of business in Massachusetts. To my knowledge, neither The Andover Companies nor Merrimack maintain any offices outside of Massachusetts.

8.    The relationship between the Andover Plan and SSgA at issue is governed by an Investment Manager Agreement ("Andover IMA"), originally effective April 1, 2001, and the letter restatement dated March 19, 2007. A copy of the Andover IMA is attached hereto as Exhibit A, and the letter restatement is attached as Exhibit B.

9.    To my knowledge, the Andover IMA was negotiated and signed in Massachusetts.

10.    Paragraph 7(d) of the Andover IMA and the restatement provides that the agreements are to be "administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts."

11.    As I understand it, the only actively managed fixed income fund in which the Andover Plan has alleged it was invested in connection with this litigation was the Enhanced Intermediate Bond Fund.

12.    All of SSgA's investment decisions on behalf of the Andover Plan's investment in the Enhanced Intermediate Bond Fund were made by SSgA portfolio managers, all of whom are

located in Massachusetts. I have been informed that nobody from SSgA has ever visited New York in connection with the Andover Plan's investment in the Enhanced Intermediate Bond Fund.

13.    It is my understanding that the Nashua Plan was established for the benefit of employees of the Nashua Corporation ("Nashua"), which is headquartered in Nashua, New Hampshire. According to its website, Nashua maintains offices in Massachusetts, but not in New York.

14.    The relationship between the Nashua Plan and SSgA at issue is governed by an Investment Management Agreement ("Nashua IMA"), originally effective May 13, 1997, and subsequently amended in part. A copy of the Nashua IMA is attached hereto as Exhibit C.

15.    To my knowledge, the Nashua IMA was negotiated and signed in Massachusetts and New Hampshire.

16.    Paragraph 7(d) of the Nashua IMA provides that the agreement is to be "administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts." None of the subsequent amendments to the Nashua IMA have affected this provision.

17.    As I understand it, the only actively managed fixed income fund in which the Nashua Plan has alleged it was invested in connection with this litigation was the Daily Bond Market Fund.

18.    All of SSgA's investment decisions on behalf of the Nashua Plan's investment in the Daily Bond Market Fund were made by SSgA portfolio managers, all of whom are located in Massachusetts. I have been informed that nobody from SSgA has ever visited New York in connection with the Nashua Plan's investment in the Daily Bond Market Fund.

4

19.    The relationship between Unisystems and SSgA at issue is governed by an Agreement of Trust ("Unisystems Agreement"), originally effective January 3, 2005, and amended in May 2007.  Copies of the Agreement of Trust and the amendment are attached hereto as Exhibits D and E.[3]

20.    Paragraph 9 of the Unisystems Agreement provides that the "trust hereby created shall be in all respects governed by the laws of Massachusetts."

21.    As I understand it, the only actively managed fixed income fund in which the Unisystems Plan has alleged it was invested in connection with this litigation was the Intermediate Bond Fund.

22.    All of SSgA's investment decisions on behalf of the Unisystems Plan's investment in the Intermediate Bond Fund were made by SSgA portfolio managers, all of whom are located in Massachusetts.

23.    It is my understanding that PRIAC offers an array of financial products and services, including pension and retirement-related services and administration.  PRIAC is incorporated in Connecticut and has its principal place of business in Hartford, Connecticut.

24.    The relationship between PRIAC and SSgA at issue is alleged to be governed by the Second Amended and Restated Investment Management Agreement ("PRIAC IMA"), which was originally entered into by State Street and Connecticut General Life Insurance Company ("CIGNA") in June 2003, and subsequently amended in part.  As I understand it, CIGNA later

---

[3] To my knowledge, although Unisystems executed the Agreement of Trust on January 3, 2005, State Street did not execute the Agreement until June 29, 2007 due to an administrative oversight.  The parties have nevertheless treated the Agreement's effective date as January 3, 2005.  For example, the May 29, 2007 letter Amendment states that  the parties "previously entered into an Agreement of Trust dated January 3, 2004."  I understand that this date is a typographical error and was intended to state that the Agreement was dated January 3, 2005.

became part of PRIAC, and the PRIAC IMA remained in effect. A copy of the PRIAC IMA is attached hereto as Exhibit F.

25.     To my knowledge, the PRIAC IMA was negotiated and signed in Massachusetts and Connecticut by the respective parties.

26.     Paragraph 7(d) of the PRIAC IMA provides that the Agreement is to be "administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts." None of the subsequent amendments to the PRIAC IMA have affected this provision.

27.     As I understand it, the PRIAC litigation concerns investments in two actively managed fixed income funds offered by SSgA – the Intermediate Bond Fund and the Government Credit Bond Fund.

28.     All of SSgA's investment decisions on behalf of PRIAC's investments in the Intermediate Bond Fund and Government Credit Bond Fund were made by SSgA portfolio managers, all of whom are located in Massachusetts. Similarly, all of SSgA's representations in connection with the PRIAC investments at issue originated in Boston, Massachusetts. I have been informed that nobody from SSgA has ever visited New York in connection with investments by PRIAC in the Intermediate or Government Credit Bond Funds.

29.     At this stage of the litigation, State Street is able to identify several potential, significant non-party witnesses – all of whom reside in Massachusetts and would not, as I understand it, be subject to compulsory process in New York. Those witnesses are:

> a. Portfolio managers for the actively managed fixed income funds at issue in the complaints during the relevant period. These former portfolio managers would testify about the challenged investment decisions regarding their respective funds,

including the investment objectives of the funds; the strategies employed to achieve those objectives and the prudence of such strategies (including so-called leveraged investments and investments in asset-backed securities); and how risk associated with investment decisions was calculated. These individuals include:

    i. Robert Pickett, who I understand was portfolio manager of the Intermediate Bond Fund during the relevant period, in which the Unisystems Plan and PRIAC clients invested, and portfolio manager of the Enhanced Intermediate Bond Fund, in which the Andover Plan invested, who would testify about investment decisions and analysis in connection with those funds;

    ii. Susan Reigel, who I understand was portfolio manager of the Daily Bond Market Fund during the relevant period, in which the Nashua Plan invested, and the Government Credit Bond Fund, in which PRIAC clients invested, who would testify about investment decisions and analysis in connection with those funds; and

    iii. Frank Gianatasio, who I understand was head of Asset Backed Securities and the secured credit group, as well as portfolio manager of the SSgA Yield Plus Fund, who would testify about investment decisions and analysis in connection with various actively managed fixed income funds.

b. Paul Greff, who was Director of Global Fixed Income during the relevant period, and who would testify about the role and organization of the Global Fixed Income group, its practice, procedures, strategies and oversight;

c.  Michael Wands, who was Director of North American Fixed Income during the relevant period, and who would testify about the role and organization of the North American Fixed Income Group, its practice, procedures, strategies and oversight;

d.  Erik Saarinen, former relationship manager for the Andover Plan and PRIAC, who would testify about SSgA's relationships with both plaintiffs;

e.  Kimberly Gluck, former relationship manager and portfolio manager for the Unisystems Plan, who would testify about SSgA's relationship with the Unisystems Plan, as well as the strategies employed on its behalf;

f.  Greg Mulready, former relationship manager and sales contact for PRIAC, who would testify about SSgA's relationship with PRIAC and the strategies employed on its behalf, as well as about the products offered by SSgA to PRIAC;

g.  Joe Dougherty, a former member of SSgA's reporting group who provided reporting for the PRIAC account, and who would testify about such reports as well as SSgA's relationship with PRIAC;

h.  Keith Fuller, Ray Dame, and Doug Lankow, representatives of CitiStreet LLC ("CitiStreet"), who would testify about the relationship between CitiStreet, State Street, and the Andover Plan, the Plan's investment objectives, the process through which the Plan made investment decisions, and CitiStreet's role; and

i.  Jay Roney, representative of New England Pension Consultants, LLC ("NEPC"), who would testify about the relationship between NEPC, State Street, and the Nashua Plan, the Plan's investment objectives, the process through which the Plan made investment decisions, and NEPC's advisory role.

30.    It is my belief that all of these individuals would find it more convenient to testify in Massachusetts, where they reside and where they are also subject to compulsory process.

31.    I believe that it would be disruptive to the business of the current employers of Erik Saarinen, Kimberly Gluck, Greg Mulready, and Joe Dougherty, as well as to CitiStreet and NEPC, for their employees to have to come to New York because of this litigation.    My understanding is that CitiStreet is a Delaware limited liability corporation with its principal place of business in Quincy, Massachusetts, while NEPC is headquartered in Cambridge, Massachusetts.

32.    At trial, State Street would also rely on testimony from the following current SSgA employees, all of whom reside and work in Massachusetts:

    a.  Members of SSgA's sales, marketing, relationship management and consultant relations teams, who would testify about the organization, function, and oversight of the client relationship groups responsible for plaintiffs' accounts, SSgA's relationships with plaintiffs, and disclosures and statements made concerning the actively managed fixed income funds at issue in these litigations.    These client relationship team members include:

        i.  Marc Brown, Chief Marketing Officer, who would testify about the role played by the client relationship group, and oversight of the client relationship teams;

        ii.  Jerry Kelly, Head of Sales, who would testify about negotiating the Unisystems Agreement;

        iii.  Larry Carlson, co-Head of U.S. Relationship Management, who would testify about negotiating and signing the Andover IMA;

iv.  Staci Reardon, co-Head of U.S. Relationship Management, who would testify about the objectives, organization, practices and procedures of the U.S. relationship management teams, as well as about oversight of those teams;

v.  Melissa Albonesi, relationship manager for the Unisystems Plan, who would testify about the relationship between SSgA and Unisystems, the stated objectives of the Unisystems Plan, representations made by SSgA, and any concerns on the part of Unisystems or the Unisystems Plan's representatives;

vi.  Dan Farley and David Ireland, both Vice Presidents of Asset Allocation, who would testify about the investment strategies and investment classes originally discussed with representatives of the Unisystems Plan;

vii.  Mark Bergin, relationship manager for the Nashua Plan, who would testify about the relationship between SSgA and Nashua, the stated objectives of the Nashua Plan, representations made by SSgA, and any concerns on the part of the Nashua Plan's representatives;

viii.  William Porter, the former consultant liaison for the Nashua Plan, who would testify about the relationship between SSgA, NEPC, and Nashua, the stated objectives of the Nashua Plan, representations made by SSgA, NEPC's advisory role, and any concerns on the part of the Nashua Plan's representatives;

ix.  Mark Flinn, the relationship manager for PRIAC, who would testify about the relationship between SSgA and PRIAC, the stated objectives of

10

PRIAC's investments on behalf of its plan clients, representations made by SSgA, and any concerns on the part of PRIAC;

    x. Sonya Hughes, the former relationship manager for PRIAC, who would testify about the relationship between SSgA and PRIAC, the stated objectives of PRIAC's investments on behalf of its plan clients, representations made by SSgA, and any concerns on the part of PRIAC; and

    xi. Brian Burke, a member of SSgA's Client Reporting and Operational Support Group, who provided reporting services for the PRIAC account, and who would testify about communications with PRIAC regarding the fixed income funds.

b. Product engineering team members for SSgA's actively managed fixed income funds. Product engineers at State Street interact with both portfolio managers, in order to develop an in-depth understanding of the funds, and clients, with whom they discuss portfolio strategies. They would testify about the analysis, interpretation, and basis for disclosures relating to the composition and performance of the active fixed income funds at issue in these cases. Product engineering team members likely to testify include:

    i. Adele Kohler, Senior Managing Director and Head of Product Engineering, who would testify about the role played by the product engineers, their practices and procedures, and oversight of the product engineers; and

    ii.   James Hopkins, head of the U.S. Fixed Income Product Engineering Group, which covers, among others, the Intermediate Bond Fund, the Enhanced Intermediate Bond Fund, the Daily Bond Market Fund, and the Government Credit Bond Fund, who would testify about analysis and disclosures in connection with those funds, as well as their performance.

33.    It would be disruptive to the business of SSgA if the foregoing employees were required to travel to New York because of this litigation. This burden would be significantly lessened if these cases were transferred to the District of Massachusetts.

34.    I believe that, if anything, transfer to Massachusetts would be more convenient for the Andover Plan, whose fiduciaries and participants work in Massachusetts.

35.    Similarly, I believe that, if anything, transfer to Massachusetts would be more convenient for the Nashua Plan, because Nashua is headquartered in Nashua, New Hampshire. To my knowledge, the distance between Nashua, New Hampshire and Boston, Massachusetts is approximately forty miles, while the distance between Nashua, New Hampshire and New York, New York is over 200 miles.

36.    I believe that litigation in Massachusetts would be no less convenient for PRIAC, whose employees work in Hartford, Connecticut. To my knowledge, the distance between Hartford, Connecticut and Boston, Massachusetts is approximately the same as, and slightly shorter than, the distance between Hartford and New York, New York.

37.    I believe that both State Street and plaintiffs would rely principally upon the testimony of the aforementioned SSgA employees, former employees, CitiStreet, and NEPC employees at trial because the allegations of the four complaints primarily concern actions taken by SSgA.

38.     Other plans invested in the active fixed income funds at issue in these cases are located in approximately 31 states (including the District of Columbia), and other international locations. I estimate that approximately 86 percent of these other plans are located outside of New York.

39.     It is my belief that the relevant records in these cases will be voluminous because of the complex financial decisions and documentation underlying the claims alleged by plaintiffs, the length of the proposed class period, the great number of SSgA employees involved in decision-making, the number of funds allegedly affected, the high volume of communications between SSgA and its clients, and the number of prospective plaintiffs. It is my understanding that the relevant records in these cases are, for the most part, in State Street's possession. All of SSgA's relevant files are located in Massachusetts. Neither SSgA nor SSBT maintains any relevant documents in New York.

40.     The relevant events underlying the complaints that took place in Massachusetts include: the formation of the actively managed fixed income funds at issue in these cases and the development of their investment strategies; decision-making concerning fund composition and risk management; trading involved with the management of each fixed income fund; analysis of the performance of the funds and comparison of their performance with the stated objectives; and the development of all promotional materials and client communications.

41.     It would be a burden for State Street to litigate this matter in New York. The vast majority of SSgA's employees and documents are in Massachusetts. The time and expense of litigating this matter in New York would be a drain on the operations of SSgA.

42.     It is my understanding that a suit against State Street also arising out of SSgA's management of an actively managed fixed income fund has been filed by Memorial Hermann

13

Healthcare System in Texas.  As I understand it, that lawsuit is in its earliest stages, and no discovery has occurred.

43.    It is my belief that it would be less burdensome for State Street and more efficient for all of the parties as well as the judicial system to litigate all five suits in a single forum.  I believe that resolution of all five cases will require similar discovery, including testimony from multiple State Street witnesses located in Massachusetts and review of documents located there. State Street has moved to transfer the lawsuit brought by Memorial Hermann from the Southern District of Texas to the District of Massachusetts.

44.    I declare under penalty of perjury that the foregoing is true and correct.


Executed on February 4, 2008


                                                        _____
                                                              Mark Duggan


14

**EXHIBIT A**

INVESTMENT MANAGER AGREEMENT

BETWEEN

STATE STREET BANK AND TRUST COMPANY

AND

MERRIMACK MUTUAL FIRE INSURANCE COMPANY

## TABLE OF CONTENTS

|     |                                                                      | Page |
|-----|----------------------------------------------------------------------|------|
| 1.  | Appointment and Acceptance; Establishment of Accounts ............... | 1    |
| 2.  | Investment in the Accounts; Investment Objectives ................... | 2    |
| 3.  | General Powers and Duties of State Street........................... | 2    |
| 4.  | State Street Representations and Warranties......................... | 3    |
| 5.  | Client Representations.............................................. | 3    |
| 6.  | Fees................................................................ | 4    |
| 7.  | Administrative Provisions .......................................... | 4    |

## INVESTMENT MANAGER AGREEMENT

THIS AGREEMENT (the "Agreement") is entered into effective as of April 1, 2001, by and between State Street Bank and Trust Company ("State Street"), a *Massachusetts trust company* and Merrimack Mutual Fire Insurance Company (the "Client").

WHEREAS, the Client has agreed to enter into a relationship with CitiStreet LLC and State Street Bank and Trust Company ("State Street") as provided for in the Employee Benefit Bundled Services Agreement (the "Bundled Services Agreement") between the Client, State Street and CitiStreet LLC; under which each will provide certain services to participants in the Plan or Plans described on Exhibit A of the Bundled Service Agreement;

WHEREAS, State Street is Trustee of the State Street Bank and Trust Company *Investment Funds for Tax Exempt Retirement Plans* (the "State Street Trust"), a trust pursuant to which State Street operates and maintains the Short Term Investment Fund, Intermediate Bond Fund Series A, US Growth & Income Fund Series A, Small Cap Growth Opportunities Fund and Aggressive Strategic Balanced Securities Lending Fund and the International Growth Opportunities Fund Series A (collectively referred to as the "Investment Funds"), bank commingled funds exempt from tax under Revenue Ruling 81-100, the assets of which consist solely of assets held in trust for the benefit of various pension and profit sharing plans qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code") and exempt from tax under Section 501(a) of the Code.

WHEREAS, the Client has been appointed as a fiduciary of The Andover Companies Employees; Savings and  Profit Sharing Plan (the "Plan") with the authority to appoint Investment Managers with respect to a portion of the assets of the Plan.  Client has also created a trust to hold the assets of the Plan (the "Trust").  Client wishes to appoint State Street as Investment Manager for certain assets of the Plan.

WHEREAS, the Client has agreed to enter into a relationship with CitiStreet LLC and State Street under which each will provide to participants in the Plan(s) a bundled package of services as provided for in the Employee Benefit Bundled Services Agreement (the "Bundled Services Agreement") between the Client, State Street and CitiStreet LLC;

NOW, THEREFORE, Client and State Street hereby agree that the terms and conditions of such appointment shall be as follows:

1. Appointment and Acceptance; Establishment of Accounts.  Client hereby appoints State Street as Investment Manager, as such term is defined in Section 3(38) of the Employee Retirement Income Security Act of 1974 ("ERISA") with respect to all cash, securities, or other property from time to time designated by Client.  The Client shall direct State Street as to the amount of such assets to be invested in the Investment Funds and State Street shall hold each such sub-divided amount in a separate "Account" (individually or collectively referred to as the "Account" or "Accounts" respectively).   State Street hereby accepts such appointment as Investment Manager pursuant to *the terms of this Agreement and agrees to act upon*

the direction of Client with respect to the investment of the assets held in the Accounts.

2. **Investment in the Accounts; Investment Objectives.** Upon transferring assets to the Accounts, Client shall direct State Street to acquire units in the Investment Funds (the "Units"). Each of the Investment Funds will be maintained in accordance with the investment objectives of each of the Investment Funds (the "Objectives"), the current form of which for each such fund is attached hereto as Exhibit 1. Client will provide State Street with notice of any changes in the Objectives. Any such change shall be effective only upon mutual acceptance, in writing, by both Client and State Street.

With respect to the Investment Funds, State Street, in its discretion, shall invest cash held by the Investment Funds in State Street's Short Term Investment Fund ("STIF") and in the following mutual funds advised by State Street: The SSgA Money Market Fund ("MM Fund") and the SSgA Yield Plus Fund ("YP Fund"). Both the MM Fund and the YP Fund currently charge a management fee of twenty-five (25) basis points and other expenses of fifteen (15) basis points in the case of the MM Fund and eleven (11) basis points in the case of the YP Fund. A copy of the prospectus for the mutual funds is being provided to you for your review.

State Street shall only invest in the MM Fund or the YP Fund when (i) the return, net of all expenses, of the YP Fund or the MM Fund exceeds the return of STIF or (ii) cash becomes available for investment after the STIF deadline, but within the deadline for investment in the mutual funds. With respect to the assets invested in the mutual funds, State Street shall waive an allocable portion of the management fee charged by the Investment Funds, as more fully outlined in paragraph 7 hereof.

3. **General Powers and Duties of State Street.** State Street shall have the following powers and duties:

(a) The Accounts.

   1. State Street shall exercise the same care in the safekeeping of the assets held in the Accounts, including the Units, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

   2. State Street shall collect all income which shall arise from, or accrue to or on account of, the property held in the Accounts, including any and all principal repayments.

   3. State Street shall report to the Client the net asset value of the Sub-Accounts, including the number and the net asset value of the Units held in each Account, within a reasonable period after the close of each month. In addition, State Street shall provide Client with an annual

2

audited financial report pertaining to each Account within a reasonable period after the end of each year.

4. State Street may hold the property in the Accounts in its name, in the name of its nominee or in bearer form.

5. State Street, its officers, directors and affiliates may (i) give advice to, and manage investments for, other customers in ways that may be the same as, or different from, its actions to carry out this Agreement, and/or (ii) have a position in tangible property, commodities, securities, options, futures, savings accounts, cash and/or short-term items that may be the same as, or different from, the positions recommended for, or acquired on behalf of, the Client. Third parties dealing with State Street shall not be required to inquire about its authority or see to the application of any money or thing of value delivered to it.

6. State Street shall not be responsible for the selection or monitoring of other investment options offered to the participants under the Plan.

4.     **State Street Representations and Warranties.** State Street represents and warrants that it is a "bank" as such term is defined in the Investment Advisers Act of 1940.

The Investment Funds are commingled funds which meet the requirements of Revenue Ruling 81-100 and consist solely of assets constituting assets of entities which qualify under Section 401(a) of the Code, including government plans as defined in Section 818(a)(6) of the Code. State Street shall continue to maintain the Funds in accordance with the terms of Revenue Ruling 81-100 and shall immediately notify Client in the event that it discovers or is notified by the Internal Revenue Service that it fails to comply with Revenue Ruling 81-100. In the event that any portion of the assets of the Investment Funds loses its tax exempt status, then State Street shall immediately cause such assets to be withdrawn from the Investment Funds. State Street acknowledges that it is a fiduciary with respect to the Investment Funds as such term is defined in Section 3(21) of ERISA.

5.     **Client Representations.** Client represents and warrants that the assets transferred to the Account consist solely of assets of a trust which qualifies under Sections 401(a) and 501(a) of the Code, including government plans as defined in Section 818(a)(6) of the Code. In the event that any assets held in the Accounts lose their tax exempt status, or the Plan loses its exempt status, Client warrants that it shall immediately cause such assets to be withdrawn from the Accounts.

The Client represents and warrants that it is a fiduciary, as defined in ERISA, and that in its capacity as a fiduciary it is authorized to appoint State Street as Investment Manager. The Client further warrants that under the plan and trust documents establishing the Plan, it has authority to enter into this Agreement and that the Plan is authorized to invest in units of commingled funds maintained by a bank.

3

The terms and conditions of the declaration of trust of the State Street Trust Stable including the Fund Declarations creating the Investment Funds, are hereby adopted and incorporated by reference into the Plan.

6.  Fees.  State Street shall be entitled to a fee in accordance with the Fee Schedule ("Exhibit 2"). Such fees shall be paid directly by the Client. Fees paid directly by the Client shall be charged to the Client quarterly in arrears based on the average month end market values within each quarter State Street will provide Client with an invoice at the end of such quarter.

State Street, however, will waive an allocable portion of the fee determined pursuant to Exhibit 2 with respect to any assets invested in either the MM Fund or the YP Fund as set forth in paragraph 2 above.

Any and all expenses directly relating to the investment of the assets of the Plans or to shareholder communications, and all taxes, including any interest and penalties with respect thereto, which may be levied or assessed under existing or future laws upon or in respect of the Investment Funds or income thereof shall, unless otherwise provided, be charged to and paid out of the assets of the respective Account to which such expense or tax relates.

7.  Administrative Provisions.

(a)  It is acknowledged that State Street and its affiliates perform investment advisory services for various clients.  Client agrees that State Street may give advice and take action in the performance of its duties with respect to any of its other clients which differ from action taken with respect to the Funds.

(b)  Neither party will assign its rights or duties under this Agreement without first obtaining the written consent of the other party.

(c)  This Agreement may be terminated by either party hereto upon thirty (30) days' written notice to the other party.

(d)  This Agreement shall be administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts.

(e)  This Agreement contains the entire understanding of the parties with respect to assets managed hereunder and there are no other warranties or representations express or implied, with respect to such management.

(f)  All notices to be given to State Street shall be mailed to:

> Compliance Officer
> State Street Bank and Trust Company

4

One International Place, 28th Floor
Boston, MA 02110

With a copy to:

General Counsel
CitiStreet LLC
Three Batterymarch Park
Quincy, MA 02169

All notices to be given to Client shall be mailed to the address listed below:

Attn:    Alan Kober, Vice President
Merrimack Mutual Fire Insurance Company
95 Old River Road
Andover, MA  01810-1078

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement effective as of the date first above written.

STATE STREET BANK AND TRUST COMPANY

BY: _____
TITLE:  PRINCIPAL

MERRIMACK MUTUAL FIRE INSURANCE COMPANY, Individually and in its capacity as a fiduciary of the Plan

BY: _____
TITLE:

5

**Exhibit 1**

**INVESTMENT OBJECTIVES**
**INVESTMENT FUNDS ACCOUNT**

**Short Term Investment Fund**
Through active management, the Fund shall seek to provide safety of principal, daily
liquidity and a competitive yield by investing in high quality money market instruments.

**Intermediate Bond Securities Fund Series A**
The Investment Objective of the Fund shall be to match or exceed the return of the
Lehman Brothers Intermediate Government Corporate Bond Index (the "Index"), while
providing participants the ability to purchase and redeem units on an "as of" basis.

**U.S. Growth & Income Fund Series A**
The Investment Objective of the Fund shall be to obtain long-tem capital appreciation,
while providing participants the ability to purchase and redeem units on an "as of"
basis.

**Small Cap Growth Opportunities Fund**
The Investment Objective of the Fund shall be to outperform the return of the Russell
2000 Growth Index.

**Aggressive Strategic Balanced Securities Lending Fund**
The Investment Objective of the Fund shall be to provide income and modest capital
growth, while providing participants the ability to purchase and redeem units on an "as
of" basis. The Fund will seek to match a composite benchmark comprised of: 55%
Standard & Poor's 500 Index; 15% Russell Special Small Company Index; 15% Morgan
Stanley Capital International Europe, Australia, and Far East ("EAFE") Index; and 15%
Lehman Brothers Aggregate Bond Index. The Fund also seeks to maintain a level of
volatility (measured as standard deviation of returns) which approximates that of the
composite benchmark returns.

**International Growth Opportunities Fund Series A**
The Investment Objectives of the Fund shall be to provide long-term capital
appreciation through equity investments in markets outside of the United States, while
providing participants the ability to purchase and redeem units on an "as of" basis.

**Exhibit 2**

FEE SCHEDULE

**Short Term Investment Fund**
40 basis points on the net asset value of the Account attributable to this Fund

**Intermediate Bond Securities Fund Series A**
50 basis points on the net asset value of the Account attributable to this Fund

**U.S. Growth & Income Fund Series A**
75 basis points on the net asset value of the Account attributable to this Fund

**Small Cap Growth Opportunities Fund**
100 basis points on the net asset value of the Account attributable to this Fund

**Aggressive Strategic Balanced Securities Lending Fund**
60 basis points on the net asset value of the Account attributable to this Fund

**International Growth Opportunities Fund Series A**
85 basis points on the net asset value of the Account attributable to this Fund

*Fees are charged for services rendered pursuant to this agreement quarterly in arrears based on the average month-end market values within each quarter. Invoices shall be rendered as indicated by the agreement subsequent to the end of the calendar quarter.*

Under normal circumstances, contributions made hereunder will be deposited into the Series Fund set forth above which, in turn, invests in a "base" fund. However, in the event that a Client plan contribution exceeds 10% of the Net Asset Value ("NAV") of the Series Fund at the time of such contribution, State Street will instead invest Client assets directly into the "base" fund identified in the Fund Declaration for the Series Fund.

The assets will be invested in the "base" fund on the first day, and then transferred out of the Base Fund and into the Series Fund on the second day. Consequently, if applicable under the terms of the Fund Declaration governing the "base" fund, the Client plan will absorb the transaction costs incurred in purchasing the securities associated with the contribution, as well as market impact costs of such purchases. Furthermore, since the "base" fund is not priced on an "as of" basis, any such contribution will be effected at the "base" fund's NAV as calculated at the end of the day on the date of the contribution, rather than at the previous day's NAV.

**EXHIBIT B**

March 19, 2007


Mr. Alan Kober
Vice President
Merrimack Mutual Fire Insurance Company
95 Old River Road
Andover, MA 01810-1078

Dear Mr. Kober

      State Street Global Advisors, a division of State Street Bank and Trust Company ("State Street") is Trustee of the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans (the "State Street Trust"), a trust pursuant to which State Street operates and maintains the Index Plus Securities Lending Series Fund Class A, the International Alpha Select Securities Lending Series Fund Class A, the Active U.S. Large Cap Value Non-Lending Series Fund Class A, the Active U.S. Large Cap Growth Non-Lending Series Fund Class A, the Active U.S. Mid Cap Non-Lending Series Fund Class A, the Intermediate Bond Non-Lending Series Fund Class A, the Aggressive Strategic Balanced Securities Lending Fund, and the Short Term Investment Fund (collectively referred to as the "Funds"). The Funds are bank commingled funds exempt from tax under Revenue Ruling 81-100, the assets of which consist solely of assets held in trust for the benefit of various pension and profit sharing plans qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code") and exempt from tax under Section 501(a) of the Code.

      Merrimack Mutual Fire Insurance Company ("Client") has been appointed as a fiduciary of the Andover Companies Employee's Savings and Profit Sharing Plan (the "Plan") with the authority to appoint Investment Managers with respect to a portion of the assets of the Plan. Client wishes to appoint State Street as Investment Manager for certain assets of the Plan, and Client and State Street hereby agree that the terms and conditions of such appointment shall be as follows:

1.      Client hereby appoints State Street as Investment Manager, as such term is defined in Section 3(38) of the Employee Retirement Income Security Act of 1974 ("ERISA") with respect to all cash, securities, or other property from time to time designated by Client. Such assets shall constitute the "Account." State Street hereby accepts such appointment as Investment Manager pursuant to the terms of this Agreement and agrees to act upon

- 2 -

the direction of Client with respect to the investment of the assets held in the Account.

2.     Upon transferring assets to the Account, Client shall direct State Street to acquire units in the Funds (the "Units"). The Funds will be maintained in accordance with investment objectives (the "Objectives"), the current form of which is attached hereto as Exhibit 1.

State Street, in its discretion, shall invest cash held by the Funds in State Street's Short Term Investment Fund ("STIF") and in the following mutual funds advised by SSgA Funds Management, Inc.: The SSgA Money Market Fund ("MM Fund") and the SSgA Yield Plus Fund ("YP Fund"). Both the MM Fund and the YP Fund currently charge a management fee of twenty-five (25) basis points and other expenses of up to seventeen (17) basis points in the case of the MM Fund, and up to thirty-three (33) basis points in the case of the YP Fund. Client acknowledges receipt of the prospectus for each of the mutual funds.

State Street shall only invest in the MM Fund or the YP Fund when (i) the return, net of all expenses, of the YP Fund or the MM Fund exceeds the return of STIF or (ii) cash becomes available for investment after the STIF deadline, but within the deadline for investment in the mutual funds. With respect to the assets invested in the mutual funds, State Street shall waive an allocable portion of the management fee charged by the Funds, as more fully outlined in paragraph 6 hereof.

3.     State Street shall have the following powers and duties with respect to the Account:

(a)     State Street shall exercise the same care in the safekeeping of the assets held in the Account, including the Units, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

(b)     State Street shall collect all income which shall arise from, or accrue to or on account of, the property held in the Account, including any and all principal repayments.

(c)     State Street shall report to Client the net asset value of the Account, including the number and the net asset value of the Units held in the Account, within a reasonable period after the close of each month. In addition, upon request State Street will provide Client with an

annual audited financial report pertaining to the Funds within a reasonable period after the end of each year.

(d)    State Street may hold the property in the Account in its name, in the name of its nominee or in bearer form.

4.    State Street represents and warrants that it is a "bank" as such term is defined in the Investment Advisers Act of 1940.

The Funds are commingled funds which meet the requirements of Revenue Ruling 81-100 and consist solely of assets constituting assets of entities which qualify under Section 401(a) of the Code, including government plans as defined in Section 818(a)(6) of the Code. State Street shall continue to maintain the Funds in accordance with the terms of Revenue Ruling 81-100 and shall immediately notify Client in the event that it discovers or is notified by the Internal Revenue Service that it fails to comply with Revenue Ruling 81-100. In the event that any portion of the assets of the Funds loses its tax exempt status, then State Street shall immediately cause such assets to be withdrawn from the Funds. State Street acknowledges that it is a fiduciary with respect to the Funds as such term is defined in Section 3(21) of ERISA.

5.    Client represents and warrants that the assets transferred to the Account consist solely of assets of a trust which qualifies under Sections 401(a) and 501(a) of the Code, including government plans as defined in Section 818(a)(6) of the Code. In the event that any assets held in the Account lose their tax exempt status, or the Plan loses its exempt status, Client warrants that it shall immediately cause such assets to be withdrawn from the Account.

Client represents and warrants that it is a fiduciary, as defined in ERISA, and that in its capacity as a fiduciary it is authorized to appoint State Street as Investment Manager. Client further warrants that under the plan and trust documents establishing the Plan, it has authority to enter into this Agreement and that the Plan is authorized to invest in units of commingled funds maintained by a bank.

The terms and conditions of the declaration of trust of the State Street Trust, including the Fund Declaration creating the Fund and the Class Description, as the case may be, are hereby adopted and incorporated by reference into the Plan.

6.    State Street shall be entitled to a fee in accordance with the Fee Schedule ("Exhibit 2"). Fees will be charged to Client quarterly in arrears based on

– 4 –

the average of the Client's month-end market values within each quarter. State Street will provide Client with an invoice subsequent to the end of each calendar quarter.

State Street, however, will waive an allocable portion of the fee determined pursuant to Exhibit 2 with respect to any assets invested in either the MM Fund or the YP Fund as set forth in paragraph 2 above.

Any and all expenses directly relating to the investment of the assets of the Plan, and all taxes, including any interest and penalties with respect thereto, which may be levied or assessed under existing or future laws upon or in respect of the Funds or income thereof shall, unless otherwise provided, be charged to and paid out of the assets of the Account.

7.     (a)    It is acknowledged that State Street and its affiliates perform investment advisory services for various clients. Client agrees that State Street may give advice and take action in the performance of its duties with respect to any of its other clients which differ from action taken with respect to the Funds.

       (b)    Neither party will assign its rights or duties under this Agreement without first obtaining the written consent of the other party.

       (c)    This Agreement may be terminated by either party hereto upon thirty (30) days' written notice to the other party.

       (d)    This Agreement shall be administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts.

       (e)    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which shall constitute the same instrument.

       (f)    This Agreement may not be amended or modified, nor may compliance with any condition or covenant set forth herein be waived, except by a writing duly and validly executed by each party hereto, or in the case of a waiver, the party waiving compliance.

       (g)    Client acknowledges that State Street may engage in internal cross-trading pursuant to applicable U.S. Department of Labor Prohibited Transaction Exemptions, acknowledges receipt of State Street's Policies for Internal Cross-Trading, and hereby authorizes State Street or its affiliates to engage in such cross-trading in connection with the Account. Additionally, in the event that the investment

– 5 –

objectives set forth in Exhibit 1 include securities lending, Client acknowledges receipt of the EquiLend disclosure and hereby authorizes State Street to utilize EquiLend or its successor in connection with management of the Account.

(h)    All notices to be given to State Street shall be mailed to:

> Compliance Officer
> State Street Global Advisors
> One Lincoln Street
> Boston, MA 02111-2900

All notices to be given to Client shall be mailed to:

> Mr. Alan Kober
> Vice President
> Merrimack Mutual Fire Insurance Company
> 95 Old River Road
> Andover, MA 01810-1078

(i)    To help the U.S. government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions such as State Street to obtain, verify, and record information that identifies each person who opens an account, including in connection with this Agreement. When Client opens an account, State Street will ask, as applicable, for Client's name, address, date of birth, and other information that will allow State Street to identify Client pursuant to U.S. Federal requirements. State Street may also ask to see other identifying documents, including drivers licenses in the case of individuals.

To acknowledge your consent to and acceptance of the terms of this Agreement, please sign in the space provided below.

– 6 –

Very truly yours,

STATE STREET GLOBAL ADVISORS, a division of
State Street Bank and Trust Company

By: _____

Title: _____

**Agreed to and Acknowledged**

Merrimack Mutual Fire Insurance Company, individually and in its capacity as
fiduciary of the Andover Companies Employee's Savings and Profit Sharing Plan

By: _____

Title: Vice President
3/27/07

**Exhibit 1**

INVESTMENT OBJECTIVES

### Index Plus Securities Lending Series Fund Class A

The Investment Objective of the Fund shall be to outperform the return of the Standard & Poor's 500 Index while providing participants the ability to purchase and redeem units on an "as of" basis.

### International Alpha Select Securities Lending Series Fund Class A

The Investment Objective of the Fund shall be to exceed the return of the Morgan Stanley Capital International EAFE Index while providing participants the ability to purchase and redeem units on an "as of" basis.

### Active U.S. Large Cap Value Non-Lending Series Fund Class A

The Investment Objective of the Fund shall attempt to outperform the return of the Russell 1000 Value Index while providing participants the ability to purchase and redeem units on an "as of" basis.

### Active U.S. Large Cap Growth Non-Lending Series Fund Class A

The Investment Objective of the Fund shall be to outperform the return of the Russell 1000 Growth Index while providing participants the ability to purchase and redeem units on an "as of" basis.

### Active U.S. Mid Cap Non-Lending Series Fund Class A

The Investment Objective of the Fund shall be to maximize total return through the investment in mid-capitalization equity securities while providing participants the ability to purchase and redeem units on an "as of" basis.

### Intermediate Bond Non-Lending Series Fund  Class A

The Investment Objective of the Fund shall be to match or exceed the return of the Lehman Brothers Intermediate Government Credit Bond Index while providing participants that ability to purchase and redeem units on an "as of" basis.

– 8 –

## Aggressive Strategic Balanced Securities Lending Fund

The Investment Objective of the Fund shall be to provide income and modest capital growth, while providing participants the ability to purchase and redeem units on an "as of" basis. The Fund will seek to match a composite benchmark comprised of: 55% Standard & Poor's 500 Index; 15% Russell Special Small Company Index; 15% Morgan Stanley Capital International Europe, Australia, and Far East Index; and 15% Lehman Brothers Aggregate Bond Index. The Fund also seeks to maintain a level of volatility (measured as standard deviation of returns) which approximates that of the composite benchmark returns.

## Short Term Investment Fund

Through active management, the Fund shall seek to provide safety of principal, daily liquidity, and a competitive yield by investing in high quality money market instruments.

**Exhibit 2**

FEE SCHEDULE

### Index Plus Securities Lending Series Fund Class A

35 basis points on the net asset value of the Account attributable to this Fund

### International Alpha Select Securities Lending Series Fund Class A

35 basis points on the net asset value of the Account attributable to this Fund

### Active U.S. Large Cap Value Non-Lending Series Fund Class A

35 basis points on the net asset value of the Account attributable to this Fund

### Active U.S. Large Cap Growth Non-Lending Series Fund Class A

35 basis points on the net asset value of the Account attributable to this Fund

### Active U.S. Mid Cap Non-Lending Series Fund Class A

35 basis points on the net asset value of the Account attributable to this Fund

### Intermediate Bond Non-Lending Series Fund  Class A

35 basis points on the net asset value of the Account attributable to this Fund

### Aggressive Strategic Balanced Securities Lending Fund

35 basis points on the net asset value of the Account attributable to this Fund

### Short Term Investment Fund

40 basis points on the net asset value of the Account attributable to this Fund

Fees are charged for services rendered pursuant to this Agreement quarterly in arrears based on the average month-end market values within each quarter. Invoices shall be rendered as indicated by the Agreement subsequent to the end of the calendar quarter.

Under normal circumstances, contributions made hereunder will be deposited into the Series Fund in which the Class set forth above participates which Series Fund, in turn, invests in a "base" fund. However, in the event that a Client plan contribution exceeds 10% of the Net Asset Value ("NAV") of the Series Fund at the time of such contribution, State Street will instead invest Client assets directly into the "base" fund identified in the Fund Declaration for the Series Fund.

The assets will be invested in the "base" fund on the first day, and then transferred out of the "base" fund and into the Series Fund on the second day. Consequently, if applicable under the terms of the Fund Declaration governing the "base" fund, the Client plan will absorb the transaction costs incurred in purchasing the securities associated with the contribution, as well as market impact costs of such purchases. Furthermore, since the "base" fund is not priced on an "as of" basis, any such contribution will be effected at the "base" fund's NAV as calculated at the end of the day on the date of the contribution, rather than at the previous day's NAV.

**EXHIBIT C**

**SS&A.**

STATE STREET GLOBAL ADVISORS

Investment Management
Two International Place
Boston, MA 02110

May 13, 1997

Mr. William Manning
Nashua Corporation
44 Franklin Street
Nashua, NH 06060

Dear Mr. Manning:

State Street Bank and Trust Company ("State Street") is Trustee of the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans (the "State Street Trust"), a trust pursuant to which State Street operates and maintains the S&P 500 Flagship Fund (the "Fund"), a bank commingled fund exempt from tax under Revenue Ruling 81-100, the assets of which consist solely of assets held in trust for the benefit of various pension and profit sharing plans qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code") and exempt from tax under Section 501(a) of the Code.

Nashua Corporation ("Client") has been appointed as a fiduciary of the Nashua Corporation Pension Plan (the "Plan") with the authority to appoint Investment Managers with respect to a portion of the assets of the Plan. Client wishes to appoint State Street as Investment Manager for certain assets of the Plan, and Client and State Street hereby agree that the terms and conditions of such appointment shall be as follows:

1.    Client hereby appoints State Street as Investment Manager, as such term is defined in Section 3(38) of the Employee Retirement Income Security Act of 1974 ("ERISA") with respect to all cash, securities, or other property from time to time designated by Client. Such assets shall constitute the "Account." State Street hereby accepts such appointment as Investment Manager pursuant to the terms of this Agreement and agrees to act upon the direction of Client with respect to the investment of the assets held in the Account.

2.    Upon transferring assets to the Account, Client shall direct State Street to acquire units in the Fund (the "Units"). The Fund will be maintained in accordance with investment objectives (the "Objectives"), the current form of which is attached hereto as Exhibit 1. Client will provide State Street with notice of any changes in the Objectives. Any such change shall be effective only upon mutual acceptance, in writing, by both Client and State Street.

In addition to investment in the Fund, State Street, in its discretion, shall invest cash held by the Fund in State Street's Short Term Investment Fund ("STIF") and in the following mutual funds advised by State Street: The SSgA Money Market Fund ("MM Fund") and the SSgA Yield Plus Fund ("YP



STATE STREET

*Serving Institutional Investors Worldwide*

**SS&A.**    - 2 -

Fund"). Both the MM Fund and the YP Fund currently charge a management fee of twenty-five (25) basis points and other expenses of fifteen (15) basis points in the case of the MM Fund, and eleven (11) basis points in the case of the YP Fund. A copy of the prospectus for each of the mutual funds is being provided to you for your review.

State Street shall only invest in the MM Fund or the YP Fund when (i) the return, net of all expenses, of the YP Fund or the MM Fund exceeds the return of STIF or (ii) cash becomes available for investment after the STIF deadline, but within the deadline for investment in the mutual funds. With respect to the assets invested in the mutual funds, State Street shall waive an allocable portion of the management fee charged by the Fund, as more fully outlined in paragraph 6 hereof.

3.    State Street shall have the following powers and duties with respect to the Account:

    (a)    State Street shall exercise the same care in the safekeeping of the assets held in the Account, including the Units, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

    (b)    State Street shall collect all income which shall arise from, or accrue to or on account of, the property held in the Account, including any and all principal repayments.

    (c)    State Street shall report to Client the net asset value of the Account, including the number and the net asset value of the Units held in the Account, within a reasonable period after the close of each month. In addition, State Street shall provide Client with an annual audited financial report pertaining to the Fund within a reasonable period after the end of each year.

    (d)    State Street may hold the property in the Account in its name, in the name of its nominee or in bearer form.

4.    State Street represents and warrants that it is a "bank" as such term is defined in the Investment Advisers Act of 1940.

The Fund is a commingled fund which meets the requirements of Revenue Ruling 81-100 and consists solely of assets constituting assets of entities which qualify under Section 401(a) of the Code, including government plans as defined in Section 818(a)(6) of the Code. State Street shall continue to maintain the Fund in accordance with the terms of Revenue Ruling 81-100 and shall immediately notify Client in the event that it discovers or is notified by the

SS&A.                                   - 3 -

Internal Revenue Service that it fails to comply with Revenue Ruling 81-100. In the event that any portion of the assets of the Fund loses its tax exempt status, then State Street shall immediately cause such assets to be withdrawn from the Fund.

State Street acknowledges that it is a fiduciary with respect to the Fund as such term is defined in Section 3(21) of ERISA.

5.   Client represents and warrants that the assets transferred to the Account consist solely of assets of a trust which qualifies under Sections 401(a) and 501(a) of the Code, including government plans as defined in Section 818(a)(6) of the Code. In the event that any assets held in the Account lose their tax exempt status, or the Plan loses its exempt status, Client warrants that it shall immediately cause such assets to be withdrawn from the Account.

Client represents and warrants that it is a fiduciary, as defined in ERISA, and that in its capacity as a fiduciary it is authorized to appoint State Street as Investment Manager. Client further warrants that under the plan and trust documents establishing the Plan, it has authority to enter into this Agreement and that the Plan is authorized to invest in units of commingled funds maintained by a bank.

The terms and conditions of the declaration of trust of the State Street Trust, including the Fund Declaration creating the Fund, are hereby adopted and incorporated by reference into the Plan.

6.   State Street shall be entitled to a fee in accordance with the Fee Schedule ("Exhibit 2"). Fees will be charged to Client quarterly in arrears based on the average of the month-end market values within each quarter and State Street will provide Client with an invoice subsequent to the end of each calendar quarter.

State Street, however, will waive an allocable portion of the fee determined pursuant to Exhibit 2 with respect to any assets invested in either the MM Fund or the YP Fund as set forth in paragraph 2 above.

Any and all expenses directly relating to the investment of the assets of the Plan, and all taxes, including any interest and penalties with respect thereto, which may be levied or assessed under existing or future laws upon or in respect of the Fund or income thereof shall, unless otherwise provided, be charged to and paid out of the assets of the Account.

7.   (a)   It is acknowledged that State Street and its affiliates perform investment advisory services for various clients. Client agrees that State Street may give advice and take action in the performance of its duties with respect to any of its other clients which differ from action taken with respect to the Fund.

**SS&A.**

-4-

    (b)    Neither party will assign its rights or duties under this Agreement without first obtaining the written consent of the other party.

    (c)    This Agreement may be terminated by either party hereto upon thirty (30) days' written notice to the other party.

    (d)    This Agreement shall be administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts.

    (e)    All notices to be given to State Street shall be mailed to:

> Compliance Officer
> State Street Bank and Trust Company
> Two International Place, 35th Floor
> Boston, MA 02110

All notices to be given to Client shall be mailed to the address listed below:

> Mr. William Manning
> Nashua Corporation
> 44 Franklin Street
> Nashua, NH 06060

    To acknowledge your consent to and acceptance of the terms of this Agreement, please sign in the space provided below.

Very truly yours,

STATE STREET BANK AND TRUST COMPANY

BY: _____

TITLE: Principal

**Agreed to and Acknowledged**

NASHUA CORPORATION, individually and in its capacity as the fiduciary of the Nashua Corporation Pension Plan

BY: _____

TITLE: Assistant Treasurer



**Exhibit 1**

INVESTMENT OBJECTIVES

**S&P 500 Flagship Fund**

The Investment Objectives of the Fund shall be to replicate, as closely as possible, the return of the Standard & Poor's 500 Index.



**Exhibit 2**

FEE SCHEDULE

**S&P 500 Flagship Fund**

.06% of the first      $30,000,000
.05% of the next        30,000,000
.04% of the next        40,000,000
.02% thereafter

Minimum annual fee:    $10,000

Transaction charges:   Contributions and withdrawals will be subject to charges of
                       $15 per equity transaction and $275 per futures transaction.

Fees are charged for services rendered pursuant to this agreement quarterly in
arrears based on the average month-end market values within each quarter.
Invoices shall be rendered as indicated by the agreement subsequent to the end of
the calendar quarter.

**EXHIBIT D**

## AGREEMENT OF TRUST

The Undersigned as Settlor hereby transfers the property shown on Schedule A to STATE STREET BANK AND TRUST COMPANY, a Massachusetts trust company with its principal place of business in Boston, Massachusetts as Trustee.

The Trustee hereby acknowledges that it has received said property in trust and agrees that it will hold, manage and invest the same in accordance with the investment objectives described in Exhibit 1, as amended from time to time, together with the net income therefrom and any other additions by the Settlor. After paying all expenses of the trust, including compensation for its services as described in Exhibit 2, the Trustee will dispose of such trust property as follows:

**FIRST:**       The Trustee shall pay to the Settlor as of the last business day of each month such part or all of the trust property as the Settlor may request in writing delivered to the Trustee at least fifteen days before then, or within such shorter period of time as may be agreed upon by the Settlor and the Trustee from time to time. The Trustee may at any time or times and for any reason pay all or any part of the trust property to the Settlor even though the Settlor does not request such payment.

**SECOND:**       Unless sooner terminated by payments of trust property, the Trust shall terminate upon the first to occur of (i) the revocation of the trust by the Settlor, (ii) the resignation of the Trustee, or (iii) the bankruptcy of the Settlor (without regard to the bankruptcy of any beneficiary of a Settlor which is a trust). Upon termination of the trust, the property then held in trust, less proper taxes, assessments, and charges, including expenses and compensation of the Trustee, shall be transferred and conveyed to the Settlor or as the Settlor may direct in writing. The Settlor may not assign or otherwise dispose of its interest in the Trust. To help the U.S. government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions such as the Trustee to obtain, verify, and record information that identifies each person who opens an account, including in connection with this Agreement. When the Settlor opens an account in connection with the trust established under this Agreement, the Trustee will ask, as applicable, for the Settlor's name, address, date of incorporation or establishment, and other information that will allow the Trustee to identify the Settlor pursuant to US federal requirements. The Trustee may also ask to see other identifying documents.

**THIRD:**       In addition to all common law and other statutory powers, the Trustee shall have and may exercise at any time or times, without license of court or notice to or consent of anyone, the following powers, authorities and discretions, which shall continue after the termination of the trust for the purpose of distributing the trust estate:

(a)    to retain, purchase and invest in any securities, regardless of their character, their quality, any requirement of diversification or any other principle applicable to investments of fiduciaries, with the investment objectives specified in Exhibit 1, as amended from time to time, and as determined by the Trustee in its sole discretion, including without limitation, in any participations or other interests in the Trustee's World Index and Global Managed Common Trust Funds;

(b)    to lend securities of the trust, on such terms as the Trustee shall determine,

- 2 -

including but not limited to utilizing EquiLend or its successor (and the Settlor hereby acknowledges receipt of the EquiLend disclosure);

(c)   to hold unproductive property, including without limitation uninvested cash;

(d)   to make contracts and covenants;

(e)   to employ agents, custodians and attorneys, and pay them reasonable compensation in addition to that of the Trustee;

(f)   to keep the whole or any part of the trust property in any jurisdiction;

(g)   to make distributions in cash or in kind or in both and conclusively determine all values; and

(h)   to participate with respect to securities of the trust in such passive account cross-trading as may be permissible pursuant to applicable U.S. Department of Labor Prohibited Transaction Exemptions.  Settlor acknowledges receipt of the Trustee's Policies for Internal Cross-Trading, and hereby consents to the trust's participation in cross-trading with respect to any passively managed mandates contemplated hereunder.

**FOURTH:**       The Trustee shall not be liable for any error of judgment or law on its own part, but it shall be liable only for its own willful default or gross negligence.

**FIFTH:**       The Trustee shall render accounts at least annually.  The Settlor shall be deemed to have approved an account if it does not communicate to the Trustee its written objection to the account within ninety (90) days after the date on which the account is rendered.  The approval of any account shall constitute a full and complete discharge to the Trustee from further accountability or liability as to all matters and transactions stated therein or shown thereby and as to all persons (whether in being or under disability or not) who have been, are then or may thereafter become entitled to share in the trust property.

**SIXTH:**       The Trustee may in writing resign at any time from the trust, but such resignation shall not be effective as against any person dealing in good faith with the apparent Trustee of the trust without knowledge thereof.

**SEVENTH:**       The Settlor shall have the right to revoke or amend this trust, either in whole or in part, by a writing signed by the Settlor and delivered to the Trustee; provided, however, that any amendment shall be effective only if consented to in writing by the Trustee.  The Trustee expressly reserves the right to amend Exhibit 1 hereto in any respect whatever and as often as desired by an instrument signed by the Trustee and acknowledged by the Settlor at least thirty (30) days' prior to the effective date of such amendment.

**EIGHTH:**       With respect to the terms of this instrument, the existence and terms of any amendments hereto, the termination of the trust hereunder and the identity, decision and actions of the Settlor and the Trustee, all persons may rely conclusively on the facts stated in a certificate signed by a Trustee.

- 3 -

**NINTH:**    The trust hereby created shall be in all respects governed by the laws of Massachusetts.  The Settlor hereby acknowledges that the assets of the trust may be invested by the Trustee in one or more of the Trustee's common trust funds, including the Trustee's World Index and Global Managed Common Trust Funds, a copy of the Declarations of Trust (the "Declarations of Trust") of which have been delivered to the Settlor with this Agreement.  The Settlor acknowledges that certain charges and expenses may be assessed against the assets of the trust under the terms of the Declarations of Trust, including those described in Section 2 of Article VI thereof.  The Settlor further acknowledges that, with respect to investment in foreign market indices, the individual weighting of a particular security may constitute a significant portion of an index (in excess of 10%), and may therefore impact the overall return of the index to a significant degree.

**TENTH:**    The Settlor represents and warrants to the Trustee that (a) this Trust is organized exclusively for the benefit of an entity described in Article II, Section 6 of the Declarations of Trust such that this Trust will constitute a "trust" as defined in Article II, Section 6 of the Declarations of Trust; (b) it has the authority to enter into and perform its obligations under this Agreement; (c) the execution and delivery of this Agreement does not violate any provision of the laws or regulations applicable to the Settlor or any governing documents pursuant to which the Settlor is established; and (d) upon acceptance by the Trustee, this Agreement shall be valid and binding upon the Settlor.

The Settlor agrees to reimburse and hold harmless the Trustee and any of the Trustee's World Index or Global Managed Common Trust Funds in which the Settlor's trust corpus may be invested from all losses, expenses, damages, liabilities, demands, charges and claims of any kind or nature whatsoever (including reasonable attorneys' fees and expenses) which result from a breach of any representation made by the Settlor in this paragraph TENTH.

- 4 -

**ELEVENTH:** This Agreement shall not be effective until accepted by the Trustee in Boston, Massachusetts.

Executed under seal this _3rd_ day of _January_, 2004.

SETTLOR: UNISYSTEMS, INC. EMPLOYEES PROFIT SHARING TRUST

By: _Warren Cohen_
Name: WARREN COHEN
Title: Executive Vice President


**Accepted and Agreed to:**

STATE STREET BANK AND TRUST COMPANY, AS TRUSTEE

By: _Staci A Reardon_
Name: Staci A Reardon
Title: Sr Managing Director

Dated: _June 29, 2007_

**Exhibit 1**

INVESTMENT OBJECTIVES

**Balanced Portfolio**

1.    **Investment Objective:**

The Investment Objective of the Portfolio shall be to match, as closely as possible, the return of a composite benchmark comprised of: 50% Standard and Poor's 500 Index, 5% MSCI EAFE Index, 5% Russell 2000 Index, and 40% Passive Intermediate Government Credit Bond Index weighted at their appropriate capitalization weights (the "Portfolio"). The Portfolio also seeks to maintain a level of volatility (measured as standard deviation of returns) which approximates that of the composite benchmark returns.

2.    **Permitted Classes of Assets and Investment Strategy:**

In order to achieve the stated investment objective, the Trustee may cause the Portfolio to indirectly make equity, fixed income and cash investments by allocating portfolio assets by acquiring units of various bank securities lending and non-securities lending commingled funds maintained by the Trustee (the "Commingled Funds"), as well as in shares of registered mutual funds for which an affiliate of the Trustee acts as the investment advisor. The Portfolio will maintain allocations to the asset classes within the Allowable Investment Range set forth below. State Street will manage allocations within these ranges to reflect economic and market conditions and to meet liquidity requirements. Such allocations are completely at the discretion of State Street. In addition, State Street may invest in asset classes outside of the Portfolio, including, but not limited to, Real Estate (REITS) and emerging markets.

Under normal market conditions the Portfolio will have allocations approximately the same as the Normal Allocation set forth below:

| Asset Classes | Normal Allocation |
|---------------|-------------------|
| Equities      | 60%               |
| Fixed Income  | 40%               |

<u>Allowable Investment Range</u>

| | |
|---|---|
| Equities | 50%-70% |
| Fixed Income | 30%-50% |

In order to manage the currency risks associated with international investments, the Portfolio will have the ability to enter into forward foreign exchange contracts solely to hedge international exposures from adverse currency moves. Any forward foreign exchange contracts entered into will be against U.S. dollars, the base currency of the Portfolio. Any forward foreign exchange contracts entered into will be based on Portfolio exposures. No forward foreign exchange contracts will be entered into which would have the effect of leveraging the Portfolio.

Pending the selection and purchase of suitable investments, assets of the Portfolio may be invested in cash or other short-term fixed income investments (including, without limitation, any mutual fund for which an affiliate of the Trustee acts as Investment Adviser (the "Mutual Fund") or a Commingled Fund. In the event any of the Mutual Funds or Commingled Funds charge a management fee, State Street will waive an allocable portion of the management fee charged to the Portfolio (as set forth in Exhibit 2 of the Agreement).

**Exhibit 2**

FEE SCHEDULE

**Balanced Portfolio**

0.70% of the net asset value of the Account per annum.

Administrative fees:          For any portion of the trust property invested in the Trustee's common trust funds (each a, "Commingled Fund") in accordance with the investment objectives set forth in Exhibit 1, the Trustee may charge annual custody fees and transaction fees. Such fees are more fully outlined in the Fund Declarations.

Fees are charged for services rendered pursuant to this Agreement quarterly in arrears based on the average of the month-end market values within each quarter. Invoices shall be rendered as indicated by the Agreement subsequent to the end of the calendar quarter.

**Schedule A**

The Settlor will make a contribution of assets in the approximate amount of one hundred and seventy thousand ($170,000) dollars.

**EXHIBIT E**

May 29, 2007


Mr. Warren Cohen
Vice President of Finance
Unisystems, Inc.
155 East 55th Street
New York, New York 10022


Re: Amendment for Participation in the Balanced Portfolio


Dear Mr. Cohen:

State Street Bank and Trust Company ("State Street") and Unisystems, Inc. Employees Profit Sharing Trust ("Settlor") have previously entered into an Agreement of Trust dated January 3, 2004 (the "Agreement"). Pursuant to the Agreement, Settlor has transferred certain assets to be held in trust and managed under one or more strategies, maintained by State Street

Settlor currently invests assets in the Balanced Portfolio Strategy (the "Strategy") maintained by State Street. Settlor and State Street now desire to modify the Investment Objectives set forth in the Agreement.

This letter shall constitute an amendment to the Agreement. The investment objectives of the Strategy are attached hereto as Exhibit 1, and shall replace the Investment Objectives currently contained in the Agreement

Except as provided herein, the terms and conditions contained in the Agreement shall remain in full force and effect.

If the above terms are acceptable to you, please countersign this letter in the space provided below, in duplicate.

Very truly yours,

STATE STREET BANK AND TRUST COMPANY

By: _Staci A Reart_

Title: _Sr Managing Director_

**Agreed to and Accepted**

UNISYSTEMS, INC. EMPLOYEES PROFIT SHARING TRUST

By: _Darrer Coh_

Title: _EXECUTIVE VICE PRES_

**Exhibit 1**

INVESTMENT OBJECTIVES

**Balanced Portfolio**

1.    **Investment Objective:**

The Investment Objective of the Portfolio shall be to match, as closely as possible, the return of a composite benchmark comprised of: 35% Standard and Poor's 500 Index, 5% S&P MidCap Index, 5% Russell 2000 Index, 15% MSCI ACWI Ex-US Index, 38% Lehman Brothers Intermediate Government Credit Index and 2% 90-day T-Bills weighted at their appropriate capitalization weights (the "Portfolio") The Portfolio also seeks to maintain a level of volatility (measured as standard deviation of returns) which approximates that of the composite benchmark returns.

2.    **Permitted Classes of Assets and Investment Strategy:**

In order to achieve the stated investment objective, the Trustee may cause the Portfolio to indirectly make equity, fixed income and cash investments by allocating portfolio assets by acquiring units of various bank securities lending and non-securities lending commingled funds maintained by the Trustee (the "Commingled Funds"), as well as in shares of registered mutual funds for which an affiliate of the Trustee acts as the investment advisor. The Portfolio will maintain allocations to the asset classes within the Allowable Investment Range set forth below State Street will manage allocations within these ranges to reflect economic and market conditions and to meet liquidity requirements. Such allocations are completely at the discretion of State Street. In addition, State Street may invest in asset classes outside of the Portfolio, including, but not limited to, Real Estate (REITS) and emerging markets.

Under normal market conditions the Portfolio will have allocations approximately the same as the Normal Allocation set forth below:

| Asset Classes | Normal Allocation |
|---|---|
| Equities | 60% |
| Fixed Income | 40% |

<u>Allowable Investment Range</u>

| | |
|---|---|
| Equities | 50%-70% |
| Fixed Income | 30%-50% |

In order to manage the currency risks associated with international investments, the Portfolio will have the ability to enter into forward foreign exchange contracts solely to hedge international exposures from adverse currency moves. Any forward foreign exchange contracts entered into will be against U.S. dollars, the base currency of the Portfolio. Any forward foreign exchange contracts entered into will be based on Portfolio exposures. No forward foreign exchange contracts will be entered into which would have the effect of leveraging the Portfolio.

Pending the selection and purchase of suitable investments, assets of the Portfolio may be invested in cash or other short-term fixed income investments (including, without limitation, any mutual fund for which an affiliate of the Trustee acts as Investment Adviser (the "Mutual Fund") or a Commingled Fund. In the event any of the Mutual Funds or Commingled Funds charge a management fee, State Street will waive an allocable portion of the management fee charged to the Portfolio (as set forth in Exhibit 2 of the Agreement)

**Exhibit 2**

FEE SCHEDULE

**Balanced Portfolio**

> 0.70% of the net asset value of the Account per annum

> Administrative fees:          For any portion of the trust property invested in the Trustee's common trust funds (each a, "Commingled Fund") in accordance with the investment objectives set forth in Exhibit 1, the Trustee may charge annual custody fees and transaction fees  Such fees are more fully outlined in the Fund Declarations.

Fees are charged for services rendered pursuant to this Agreement quarterly in arrears based on the average of the month-end market values within each quarter.  Invoices shall be rendered as indicated by the Agreement subsequent to the end of the calendar quarter.

**EXHIBIT F**

## SECOND AMENDED AND RESTATED
## INVESTMENT MANAGEMENT AGREEMENT

THIS SECOND AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT dated as of June ___, 2003, by and between State Street Global Advisors, a division of State Street Bank and Trust Company ("State Street") and Connecticut General Life Insurance Company ("Client").

WHEREAS, State Street and Client have entered into an Investment Management Agreement dated October 8, 1996, an Investment Management Agreement dated October 8, 1996, an Investment Management Agreement dated October 8, 1996, an Investment Management Agreement dated November 1, 1996, an Investment Management Agreement dated February 22, 2000, an Investment Management Agreement dated February 22, 2000, amendments dated October 16, 1997, September 5, 2002, March 6, 2003, and the Amended and Restated Investment Management Agreement dated May 8, 2002 (the agreements and all amendments respectively thereto being the "Original Agreements").

WHEREAS, State Street is Trustee of the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans (the "State Street Trust"), a trust pursuant to which State Street operates and maintains the various bank commingled funds (the "Funds"), exempt from tax under Revenue Ruling 81-100, the assets of which consist solely of assets held in trust for the benefit of various pension and profit sharing plans qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code") and exempt from tax under Section 501(a) of the Code;

WHEREAS, Client is a fiduciary of the various segregated accounts ("Segregated Accounts") with the authority to appoint Investment Managers with respect to a portion of the assets of the Segregated Accounts, and under the Original Agreements, Client appointed State Street as Investment Manager for certain assets of the Segregated Accounts to be invested in the Funds.

NOW THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, Client and State Street hereby consolidate, amend and restate the Original Agreements in their entirety and hereby agree to the following terms and conditions:

1.   Client hereby appoints State Street as Investment Manager, as such term is defined in Section 3(38) of the Employee Retirement Income Security Act of 1974 ("ERISA") with respect to all cash, securities, or other property from time to time designated by Client. Such assets shall constitute the "Account." State Street hereby accepts such appointment as Investment Manager pursuant to the terms of this Agreement and agrees to act upon the direction of Client with respect to the investment of the assets held in the Account.

- 2 -

2.    Upon transferring assets to the Account, Client shall direct State Street to acquire units in the Funds (the "Units"). The Funds will be maintained in accordance with investment objectives (the "Objectives"), the current form of which is attached hereto as Exhibit I.

State Street, in its discretion, shall invest cash held by the Funds in State Street's Short Term Investment Fund ("STIF") and in the following mutual funds advised by State Street: The SSgA Money Market Fund ("MM Fund") and the SSgA Yield Plus Fund ("YP Fund"). Both the MM Fund and the YP Fund currently charge a management fee of twenty-five (25) basis points and other expenses of up to thirteen (13) basis points in the case of the MM Fund, and up to twenty-three (23) basis points in the case of the YP Fund. A copy of the prospectus for each of the mutual funds is being provided to you for your review.

State Street shall only invest in the MM Fund or the YP Fund when (i) the return, net of all expenses, of the YP Fund or the MM Fund exceeds the return of STIF or (ii) cash becomes available for investment after the STIF deadline, but within the deadline for investment in the mutual funds. With respect to the assets invested in the mutual funds, State Street shall waive an allocable portion of the management fee charged by the Funds, as more fully outlined in paragraph 6 hereof.

3.    State Street shall have the following powers and duties with respect to the Account:

    (a)    State Street shall exercise the same care in the safekeeping of the assets held in the Account, including the Units, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

    (b)    State Street shall collect all income which shall arise from, or accrue to or on account of, the property held in the Account, including any and all principal repayments.

    (c)    State Street shall report to the Client the net asset value of the Account, including the number and the net asset value of the Units held in the Account, within a reasonable period after the close of each month. In addition, State Street shall provide Client with an annual audited financial report pertaining to the Funds within a reasonable period after the end of each year.

    (d)    State Street may hold the property in the Account in its name, in the name of its nominee or in bearer form.

4.    State Street represents and warrants that it is a "bank" as such term is defined in the Investment Advisers Act of 1940.

- 3 -

The Funds is a commingled funds which meet the requirements of Revenue Ruling 81-100 and consist solely of assets constituting assets of entities which qualify under Section 401(a) of the Code, including government plans as defined in Section 818(a)(6) of the Code. State Street shall continue to maintain the Funds in accordance with the terms of Revenue Ruling 81-100 and shall immediately notify Client in the event that it discovers or is notified by the Internal Revenue Service that it fails to comply with Revenue Ruling 81-100. In the event that any portion of the assets of the Funds loses its tax exempt status, then State Street shall immediately cause such assets to be withdrawn from the Funds.

State Street acknowledges that it is a fiduciary with respect to the Funds as such term is defined in Section 3(21) of ERISA.

Client represents and warrants that the assets transferred to the Account consist solely of assets held by a segregated asset account maintained by a life insurance company comprised solely of assets of plans or plan trusts which have been identified to Client as qualifying under Sections 401(a) and 501(a) of the Code, including government plans as defined in Section 818(a)(6) of the Code. In the event that Client learns that any assets held in the Account lose their tax exempt status, or the Segregated Account loses its exempt status, Client warrants that it shall immediately cause such assets to be withdrawn from the Account.

Client represents and warrants that it is a fiduciary, as defined in ERISA, and that in its capacity as a fiduciary it is authorized to appoint State Street as Investment Manager. The Client further represents and warrants that it has authority to enter into this Agreement and that the Segregated Account is authorized to invest in units of commingled funds maintained by a bank.

The terms and conditions of the declaration of trust of the State Street Trust, including the Fund Declarations creating the Funds, are hereby adopted and incorporated by reference and shall be considered as part of the plans and trusts participating in the Segregated Account.

6.    State Street shall be entitled to a fee in accordance with the Fee Schedule ("Exhibit 2"). Fees will be charged to Client quarterly in arrears based on the net asset value of the Account at the end of the quarter and State Street will provide Client with an invoice at the end of such quarter. Any contributions and/or withdrawals from the Account will be prorated based on the number of days remaining in the quarter and the fee will be adjusted appropriately.

State Street, however, will waive an allocable portion of the fee determined pursuant to Exhibit 2 with respect to any assets invested in either the MM Fund or the YP Fund as set forth in paragraph 2 above.

-4-

Any and all expenses directly relating to the investment of the assets of the Segregated Account, and all taxes, including any interest and penalties with respect thereto, which may be levied or assessed under existing or future laws upon or in respect of the Funds or income thereof shall, unless otherwise provided, be charged to and paid out of the assets of the Account.

7.  (a)  It is acknowledged that State Street and its affiliates perform investment advisory services for various clients.  Client agrees that State Street may give advice and take action in the performance of its duties with respect to any of its other clients which differ from action taken with respect to the Funds.

(b)  Neither party will assign its rights or duties under this Agreement without first obtaining the written consent of the other party.

(c)  This Agreement may be terminated by the Client giving written notice of termination and such termination shall be effective upon the date specified in such notice.  State Street may terminate this Agreement by giving written notice to Company at least one hundred and eighty (180) days prior to the date on which such termination is to become effective.

(d)  This Agreement shall be administered and construed, to the extent permitted by ERISA, according to the laws of the Commonwealth of Massachusetts.

(e)  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which shall constitute the same instrument.

(f)  This Agreement may not be amended or modified, nor may compliance with any condition or covenant set forth herein be waived, except by a writing duly and validly executed by each party hereto, or in the case of a waiver, the party waiving compliance.

(g)  This Agreement, including the Exhibits hereto, constitutes the entire understanding between the parties relating to the management of the assets of the Segregated Accounts invested in the Funds, and merges and supersedes all prior discussions and writings between the parties relating to such investment management, including without limitation the Original Agreements. Neither party shall be bound by any condition, warrant or representation other than as expressly stated in this Agreement or as subsequently set forth in a writing signed by both parties.

(h)  Client acknowledges that State Street may engage in internal cross-trading pursuant to applicable U.S. Department of Labor Prohibited Transaction Exemptions, acknowledges receipt of State Street's Policies for Internal Cross-Trading, and hereby authorizes State Street or its affiliates to engage in

- 5 -

such cross-trading in connection with the Account. Additionally, Client acknowledges receipt of the EquiLend disclosure and hereby authorizes State Street to utilize EquiLend or its successor in connection with management of the Account.

(i)    All notices to be given to State Street shall be mailed to:

> Compliance Officer
> State Street Global Advisors
> Two International Place, 34th Floor
> Boston, MA  02110

All notices to be given to Client shall be mailed to:

> CIGNA Retirement & Investment Services, H09F
> 280 Trumbull Street
> Hartford, CT 06103

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be signed by their duly authorized representatives as of the date first written above.

STATE STREET GLOBAL ADVISORS, a division of
State Street Bank and Trust Company

BY: _____
TITLE:    **Timothy Connolly**
          **Sr. Principal**

**Agreed to and Accepted:**

CONNECTICUT GENERAL LIFE INSURANCE COMPANY, individually and in its capacity as a fiduciary of each Segregated Account

BY: _____
TITLE:    Senior Vice President

**Exhibit 1**

INVESTMENT OBJECTIVES

Each of the following Funds provide participants the ability to purchase and redeem units on an "as of" basis.

**Government Credit Bond Fund Series A**

The Investment Objective of the Fund shall be to match or exceed the return of the Lehman Brothers Government Credit Bond Index.

**Intermediate Bond Securities Lending Fund Series A**

The Investment Objective of the Fund shall be to match or exceed the return of the Lehman Brothers Intermediate Government Corporate Bond Index.

**Russell 3000 Index Securities Lending Fund Series A**

The Investment Objective of the Fund shall be to match, as closely as possible, the return of the Russell 3000 Index.

**Passive Bond Market Index Securities Lending Fund Series A**

The Investment Objectives of the Fund shall be to match, as closely as possible, the return of the Lehman Brothers Aggregate Bond Index.

**Daily EAFE Securities Lending Fund Series T**

The Investment Objective of the Fund shall be to match, as closely as possible, the performance of the Morgan Stanley Capital International EAFE Index.

**Russell 2000 Index Securities Lending Fund Series A**

The Investment Objective of the Fund shall be to match, as closely as possible, the return of the Russell 2000 Index.

**S & P Midcap Index Fund Series A**

The Investment Objective of the Fund shall be to match, as closely as possible, the return of the Standard & Poor's Midcap Index.

**Exhibit 2**

FEE SCHEDULE

**Government Credit Bond Fund Series A** (effective October 1, 2001)

        0.10% on the first     $50,000,000
        0.08% on the next    $50,000,000
        0.06% thereafter

**Intermediate Bond Securities Lending Fund Series A** (effective October 1, 2001)

        0.10% on the first     $50,000,000
        0.08% on the next    $50,000,000
        0.06% thereafter

**Russell 3000 Index Securities Lending Fund Series A** (effective October 1, 2001)

        0.08% of the first     $50,000,000
        0.06% of the next    $50,000,000
        0.04% thereafter

**Passive Bond Market Index Securities Lending Fund Series A** (effective October 1, 2001)

        0.05% flat fee on the net asset value of the Account per Annum.

**Daily EAFE Securities Lending Fund Series T** (effective October 1, 2001)

        0.10% flat fee on the net asset value of the Account per Annum.

**Russell 2000 Index Securities Lending Fund Series A** (effective January 1, 2002)

        0.08% of the first     $50,000,000
        0.06% of the next    $50,000,000
        0.04% thereafter

**S & P Midcap Index Fund Series A** (effective May ___, 2003)

        0.08% of the first     $50,000,000
        0.06% of the next    $50,000,000
        0.04% thereafter

Under normal circumstances, contributions made hereunder will be deposited into the Series Fund set forth above which, in turn, invests in a "base" fund. However, in the event that a Client plan contribution exceeds 10% of the Net Asset Value ("NAV") of the

Series Fund at the time of such contribution, State Street will instead invest Client assets directly into the "base" fund identified in the Fund Declaration for the Series Fund.

The assets will be invested in the "base" fund on the first day, and then transferred out of the "base" fund and into the Series Fund on the second day. Consequently, if applicable under the terms of the Fund Declaration governing the "base" fund, the Client plan will absorb the transaction costs incurred in purchasing the securities associated with the contribution, as well as market impact costs of such purchases. Furthermore, since the "base" fund is not priced on an "as of" basis, any such contribution will be effected at the "base" fund's NAV as calculated at the end of the day on the date of the contribution, rather than at the previous day's NAV.

Fees are charged for services rendered pursuant to this Agreement quarterly in arrears based on the average month-end market values within each quarter. Invoices shall be rendered as indicated by the Agreement subsequent to the end of the calendar quarter. Any contributions and/or withdrawals from the Account will be prorated based on the number of days remaining in the quarter and the fee will be adjusted appropriately.